UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-20407-CR-WILLIAMS

UNITED STATES OF AMERICA

vs.

VLADIMIR NEVIDOMY,

       Defendant.
_____/

## PLEA AGREEMENT

The United States of America and Vladimir Nevidomy, (hereinafter referred to as the "defendant") enter into the following agreement:

1. The defendant agrees to plead guilty to count 1 of the Indictment, which charges the defendant with conspiracy to export defense articles from the United States to Russia, without having first obtained a license, in violation of the Arms Export Control Act (AECA) (22 U.S.C. § 2778) and the International Traffic in Arms Regulations (ITAR), (22 CFR §§121.1, 123.1, and 127.1); all in violation of Title 18, United States Code, Section 371. The Government agrees to dismiss the remaining counts, Count 2-8, against the defendant at the time of sentencing.

2. The defendant is aware that the sentence will be imposed by the court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the court relying in part on the results of a Pre-Sentence Investigation by the court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the court may depart from the advisory

sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence; the court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense(s) identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

3. The defendant also understands and acknowledges that the court may impose a statutory maximum term of 5 years imprisonment, followed by a term of supervised release of up to 3 years. In addition to a term of imprisonment and supervised release, the court may impose a fine of up to $250,000.

4. The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, a special assessment in the amount of $100 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

5. The Office of the United States Attorney for the Southern District of Florida (hereinafter "Office") reserves the right to inform the court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations

contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

6. The United States agrees that it will recommend at sentencing that the court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will make a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently. The United States, however, will not be required to make these recommendations if the defendant:

    a. fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct;

    b. is found to have misrepresented facts to the government prior to entering into this plea agreement; or

    c. commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

7. The parties agree to recommend that this case be consolidated for sentencing purposes with *U.S. v. Nevidomy*, Case Number 17-CR-60137-Williams, and recommend a

concurrent sentence in both cases.

8. The United States also agrees that it will recommend a term of imprisonment at the low end of the Sentencing Guidelines, which is 46 months imprisonment, under Guidelines Section 2M5.2 (offense level 23 after a three-level reduction for early acceptance of responsibility).

9. The defendant is aware that the sentence has not yet been determined by the court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the court. The defendant understands further that any recommendation that the government makes to the court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the court and the court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 3 above, that the defendant may not withdraw his plea based upon the court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

10. The defendant is aware that Title 18, United States Code, Section 3742 and Title 28, United States Code, Section 1291 afford the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Sections 3742 and 1291 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or an upward variance from the advisory guideline range that the Court establishes at sentencing. The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United

States Code, Section 3742(b) and Title 28, United States Code, Section 1291. However, if the United States appeals the defendant's sentence pursuant to Sections 3742(b) and 1291, the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the defendant acknowledges that the defendant has discussed the appeal waiver set forth in this agreement with the defendant's attorney. The defendant further agrees, together with the United States, to request that the Court enter a specific finding that the defendant's waiver of the defendant's right to appeal the sentence to be imposed in this case was knowing and voluntary.

11. This is the entire agreement and understanding between this Office and the defendant. There are no other agreements, promises, representations, or understandings.

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

Date: 3-19-18  By: _____
MICHAEL E. THAKUR
ASSISTANT UNITED STATES ATTORNEY

Date: 3-19-18  By: _____ FOR
CHRISTIAN E. FORD
DEPARTMENT OF JUSTICE TRIAL ATTORNEY

Date: 3/19/18  By: _____
PHILIP R. HOROWITZ, ESQ.
ATTORNEY FOR DEFENDANT

Date: 3-19-18  By: _____
VLADIMIR NEVIDOMY
DEFENDANT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-20407-CR-WILLIAMS

UNITED STATES OF AMERICA

v.

VLADIMIR NEVIDOMY,

Defendant.
_____/

## FACTUAL PROFFER

The United States of America and Vladimir NEVIDOMY (hereinafter referred to as the "defendant" or "NEVIDOMY") agree that if this matter had proceeded to trial, the government's evidence would have shown, beyond a reasonable doubt, that, among other things:

NEVIDOMY and his co-defendant Dmitrii MAKARENKO, a/k/a "Dmitryi," (hereinafter "MAKARENKO") conspired to export defense articles from the United States to Russia, without having first obtained a license, in violation of the Arms Export Control Act (AECA) (22 U.S.C. § 2778), and the International Traffic in Arms Regulations (ITAR), (22 CFR §§121.1, 123.1, and 127.1); all in violation of 18 U.S.C. § 371.

The scheme worked as follows: from as early as April 2013 through November 2013, MAKARENKO and other customers in Russia contacted NEVIDOMY by email requesting to buy night vision rifle scopes, thermal monoculars, and ammunition primers, which were on the U.S. Munitions List; 2) NEVIDOMY received quotes from U.S. vendors for these controlled defense articles; 3) NEVIDOMY e-mailed MAKARENKO a quotation with price and terms for the defense

1

articles; 4) MAKARENKO made wire transfers from bank accounts in Shanghai, China and Riga, Latvia, to NEVIDOMY's Primex business account in South Florida to pay NEVIDOMY for the defense articles; 5) after the U.S. vendors sent the defense articles to NEVIDOMY in South Florida, NEVIDOMY then shipped them to MAKARENKO in Russia by one of two methods: either by concealing the articles in household goods shipments in containers sent through a freight forwarding company or by using a private Russian postal service that operates in South Florida.

These night vision rifle scopes, thermal monoculars, and ammunition primers required a license to be exported from the U.S. since they were on the U.S. Munitions List. A certified license history check revealed that neither NEVIDOMY, MAKARENKO, nor Primex ever applied or attempted to apply for an export license from the State Department for any of the primers or night-vision equipment described in this proffer.

The following transactions are overt acts in the conspiracy that the government would have proved at trial:

### Transaction 1 – MARS 4x4 Night-Vision Rifle Scopes

On or about April 12, 2013, MAKARENKO sent an email to NEVIDOMY requesting the purchase of two ATN MARS 4x4 night-vision rifle scopes and explaining that a United States vendor had refused to sell the scopes to MAKARENKO because they are "restricted from shipping to" MAKARENKO's location in Russia.

Four days later, NEVIDOMY followed up with an email to MAKARENKO quoting the price and shipping costs as $11,755 for the export of two ATN MARS 4x4 night-vision rifle scopes.

That same day, on or about April 16, 2013, MAKARENKO caused a wire transfer to be

sent from a bank account in Shanghai, China, to the bank account of NEVIDOMY's company, Primex Group, Inc., in the Southern District of Florida, in the amount of $11,755 for the purchase and shipping of the two ATN MARS 4x4 night-vision rifle scopes.

Also that same day, NEVIDOMY paid a United States vendor located in Huntsville, Texas, $9,599 for the purchase of two ATN MARS 4x4 night-vision rifle scopes.

In or around June 2013, NEVIDOMY aided and abetted the export of two ATN MARS 4x4 night-vision rifle scopes from the United States to MAKARENKO in Russia.

### Transaction 2 – ODIN 61BW Thermal Multi-Purpose Monocular

On or about April 17, 2013, MAKARENKO sent an email to NEVIDOMY requesting the purchase of one ODIN 61BW thermal multi-purpose monocular.

On or about April 29, 2013, NEVIDOMY sent an email message to a United States vendor located in Antioch, California, requesting the purchase of one ODIN 61BW thermal multi-purpose monocular. That day, NEVIDOMY also emailed the California vendor a signed export compliance form acknowledging that the vendor's products are subject to United States export control laws and regulations and that "it is unlawful to export or re-export, or to attempt to export" the vendor's products without obtaining the required licenses or written approvals from the United States government.

On or about May 2, 2013, NEVIDOMY caused a wire transfer in the amount of $10,000 to be sent from the bank account of Primex Group, Inc., in the United States, to the bank account of the California vendor for the purchase of one ODIN 61BW thermal multi-purpose monocular.

On or about June 12, 2013, NEVIDOMY sent an email message to MAKARENKO explaining that the ODIN 61BW thermal multi-purpose monocular would be delivered within the

3

week but because a private Russian courier office was being audited the courier office recommended "not to ship the night vision scopes at this time, in order to avoid problems."

In or around August 2013, NEVIDOMY exported the ODIN 61BW thermal multi-purpose monocular from the United States to MAKARENKO in Russia .

On or about August 23, 2013, MAKARENKO told NEVIDOMY via a WhatsApp message, "I received ODIN yesterday."

### Transaction 3 – MARS 4x4 Night-Vision Rifle Scope

On or about June 3, 2013, NEVIDOMY sent an email message to a United States vendor located in Arkansas requesting a quote for the purchase of a MARS 4x4 night-vision rifle scope. That day, MAKARENKO sent an email to NEVIDOMY stating that he did not need the mounting for the night-vision scope.

On or about June 4, 2013, NEVIDOMY caused a wire transfer in the amount of $2,500 to be sent from the bank account of Primex Group, Inc., to the bank account of the Arkansas vendor, part of which was a deposit for the purchase of the MARS 4x4 night-vision rifle scope.

On or about June 5, 2013, NEVIDOMY caused a wire transfer in the amount of $9,599 to be sent from the bank account of Primex Group, Inc., in the Southern District of Florida, to the bank account of the vendor located in Arkansas, part of which was for the purchase of the MARS 4x4 night-vision rifle scope.

That day, MAKARENKO caused a wire transfer in the amount of $18,036 to be sent from a bank account in Riga, Latvia, to the bank account of NEVIDOMY's company, Primex Group, Inc., in the Southern District of Florida, part of which was for the purchase of the MARS 4x4 night-vision rifle scope.

On or about June 12, 2013, NEVIDOMY sent an email message to the Arkansas vendor, attaching an "ITAR Compliance Acknowledgement" form on behalf of MAKARENKO acknowledging his responsibility to comply with United States export control laws and regulations, including licensing requirements.

On or about June 12, 2013, NEVIDOMY sent an email message to MAKARENKO informing him, in pertinent part, that the night-vision rifle scope will arrive later and that NEVIDOMY will put it in a container for shipment.

In or around July 2013, NEVIDOMY exported a MARS 4X4 night-vision rifle scope from the United States to Russia.

### Transaction 4 – Sellier & Bellot Firearm Ammunition Primers

On or about July 19, 2013, MAKARENKO sent an email message to NEVIDOMY requesting the purchase of 1,000 large-rifle ammunition primers to be placed in a container in Miami, Florida, for shipment to Vladivostok, Russia.

On or about August 30, 2013, MAKARENKO forwarded an email message to NEVIDOMY describing the ammunition primers previously requested.

On or about September 1, 2013, NEVIDOMY ordered 1,000 ammunition primers from the Arkansas vendor.

On or about September 5, 2013, in response to an email from the vendor in Arkansas indicating that the Sellier & Bellot firearm ammunition primers had been shipped, NEVIDOMY replied, asking how much they cost and stating that he would wire the payment.

On or about October 2, 2013, NEVIDOMY attempted to ship a parcel from in or around Sunny Isles, Florida, to MAKARENKO in Vladivostok, Russia, containing 1,000 Sellier & Bellot

firearm ammunition primers. These ammunition primers were seized by U.S. Customs and Border Protection.

On or about November 20, 2013, after MAKARENKO received a letter from United States Customs and Border Protection indicating that the primers had been seized for attempted illegal export without a license, MAKARENKO sent an email message to NEVIDOMY asking, "what are we going to do?"

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

Date: 3-19-18    By: _____
MICHAEL E. THAKUR
ASSISTANT UNITED STATES ATTORNEY

Date: 3-19-18    By: _____
CHRISTIAN E. FORD
DEPARTMENT OF JUSTICE TRIAL ATTORNEY

Date: 3/19/18    By: _____
PHILIP R. HOROWITZ, ESQ.
ATTORNEY FOR DEFENDANT

Date: 3-19-18    By: _____
VLADIMIR NEVIDOMY
DEFENDANT